PER CURIAM:
This is a claim filed by an Executrix under West Virginia Code 55-7-6 (historically Lord Campbell’s Act) for the wrongful death of her decedent.
On July 22, 1987, at about 4:10 p.m., Herbert F. Hinkle, claimant’s decedent, was operating a 1950 Massey Ferguson farm tractor, with rear wheel chains attached, in a westerly direction on the northerly side of West Virginia Secondary Route 5/5 in Pendleton County, West Virginia, known and hereinafter referred to as Germany Valley Road, en route from his nearby home to his nearby church, in order to spread gravel. A “scoop” (front-mounted bucket) was turned downward, and the rear end of the tractor was weighted for stability. The weather was clear and dry, and the road straight.
The decedent had crossed a bridge over the Northfork River, and had thereafter proceeded, along the northerly side of the road, the tractor’s right wheels on the berm and the left wheels on *23 the pavement of the road, some 369 feet, 5 inches from the bridge, when the tractor’s right wheels struck a depression or void place in the berm. Mr. Hinkle lost control of the tractor, which flipped to the right and rolled down a steep embankment and landed on Mr. Hinkle, causing his death.
For purposes of this opinion, the Germany Valley Road between the Northfold River on the east and U.S. Route 33 on the west, a distance of less than one-half-mile in the aggregate, will be referred to as the “roadway,” and the point where the tractor went over the embankment will be referred to as the “scene of the accident.”
The claimant, the duly qualified Executrix of the will of Herbert F. Hinkle, alleges that respondent had duties, 1) to design, construct and maintain the roadway in a condition safe for the traveling public, including the decedent, and 2) to protect the traveling public from a hazardous condition in the roadway, by placing warning signs in the vicinity of the dangerous place and by erecting and maintaining protective barriers at the scene of the accident, further alleging that respondent had a duty to cut weeds around and over the depression or void place in the berm; and claimant further alleges that respondent was guilty of negligence by failing to perform said duties, and that its negligence proximately caused the death of Mr. Hinkle.
By its Answer, respondent denies that it was negligent; alleges that negligence on the part of the decedent was the proximate cause of his death, that there were intervening or superseding causes of the death, that there were intervening or superseding causes of the death of Mr. Hinkle not attributable to the respondent, and that decedent assumed the risk of injury by being on the roadway; and respondent invokes comparative negligence as an affirmative defense.
Deeming the configuration of the Germany Galley Road between the Northfork River and U.S. Route 33, and its appearance and condition at the time of the accident to be essential to an understanding of the issues in this case, the Court will essay a short history of the roadway, as well as a brief description of its physical features at the time of the accident, insofar as they are pertinent to a decision in this case.
Germany Valley Road has been a public road from “the time whereof the memory of man runneth not to the contrary.” Only since 1933, when the State assumed responsibility for “county” roads, has it been part of the state road system. The “roadway” (between Northfork River and U.S. Route 33) is essentially level, river bottom land, with working farm land on either side. Until 1959 the roadway followed the natural grade of the land through which it ran.
In 1959, however, the respondent, or its predecessor State agency, undertook to rebuild and realign the roadway and, to do so, acquired from one Harper (Deed Book 80, page 186) a fee simple title to a parcel of 1.22 acres, running eastwardly from U.S. Route 33, toward the Northfork River. The westerly part of such acquisition was 80 feet in width, and the remainder part 50 feet in width. By the deed aforesaid, respondent covenanted, as part of the consideration for the land transfer, to construct and maintain a “cattlepass,” under the road to be constructed, *24 for the movement of Harper’s cattle from his land on the northerly side of the rebuilt road to his land on the southernly side thereof. To fulfill its contractual obligation to Harper, respondent designed and built an earthen ramp, over a metal culvert for cattle, and constructed a road over the ramp, which, at the point where the road passed over the Culvert, was about 10 feet above natural ground level. The width of the road over the ramp was 19 feet, 8 inches, and the paved surface of the road was 14 feet in width, from 1960 until 1985; in 1985 the pavement was widened to 16 feet and 3 inches, but the berm was not widened. The embankments on both sides of the culvert were about 10 feet above natural ground level and were very steep; in the vicinity of the culvert they were reinforced by stone.
There was testimony that, after the pavement was widened in 1985, there was a berm along the roadway, from Northfork River to U.S. Route 33, of 12 to 18 inches. The investigating officer, Sergeant Gary White, testified that, generally on the ramp there was a berm of 12"to 18" on each side of the pavement, but that at the scene of the accident “there’s very little berm there at all. It just dropped in.” A witness for the claimant, Jimmy Morgan Bogan, a frequent traveler on the road, testified with reference to the berm at the scene of the accident, “To my knowledge, they just wasn’t no shoulder there.” The decedent’s daughter Betty L. Marshall, testified that grass obscured the point where the berm should have been at the scene of the accident, and that one looking down at that point “could see where there was nothing there.” Respondent’s witness, James M. Waybright, crew leader of the maintenance force which worked on roads in the area at and before July 22, 1987, testified with reference to the scene of the accident, “... the berm on top was never more than eight inches because it was walled up with rocks, small like rocks, walled straight up to that.” Respondent’s witness, William W. Hartman, Maintenance Engineer for District 8 of the Division of Highways, testified that some time after the accident he examined the berm at the scene of the accident and estimated its width to have been six to eight inches.
There was evidence as to the presence of weeds on the embankment, at and near the scene of the accident, conflicting s to how recently they had been cut, and the effect of weeds at that point as possibly having obscured decedent’s ability to detect the defect in the berm; but we are of the opinion that the evidence, ore terms and by photographs admitted into the record, is inconclusive and conjectural.
What is certain, however, is that:
a)
the berm at the scene of the accident was, on July 22, 1987, and for whatever reason, inexcusably inadequate to support any kind of motor vehicle, and the deficiency had existed for at least two years before the accident and was known or should have been known to respondent for that whole period, inasmuch as respondent’s employees and their supervisors had frequently worked in the immediate area;
*25 b)
there were, on that date, no signs at or near the scene of the accident, to warn travelers of a dangerous condition in the roadway.
c)
there were no barriers, erected by respondent, to prevent a traveler from falling of the road at that point, where there was little or no shoulder.
d)
the tractor which Mr. Hinkle was driving had been operated by him, immediately before the accident, in a lawful manner, and in a manner which was customary and acceptable in the community, i.e., with the right wheels on the berm; and
e)
the decedent knew, or should have known by reason of his life-long familiarity with and use of said roadway, of the deficiency in the berm at the scene of the accident.
Immediately before the accident Mr. Hinkle, then 67 years of age and in good health, was a semi-retired farmer, and was drawing a small Social Security retirement benefit. In his earlier years he had been a most industrious and productive individual, engaged not only extensively in farming, but also as operator of a sawmill and a repair garage. On his income tax returns for 1985 and 1987, Schedules C, he showed no net income, his receipts from his efforts in those years being matched by his expenses in his businesses.
Mr. Hinkle was survived by his wife of many years, Avanell R. Hinkle, by two married daughters, and by his dependent mother of advanced years, who resided with him and his wife.
The emotional, psychological, physical, and economic effect of Mr. Hinkle’s sudden death, on Avanell R. Hinkle, his wife, was quite severe. We are given to believe, from the evidence, that all through her married life she had been a homemaker, and was entirely dependent upon him, not only as a source of income but also for moral support and comfort, transportation, record-keeping, business transactions and advice; in short, she left activities outside of the home to her husband; after his death, being unable to handle the businesses, she was forced to sell most of her husband’s livestock and other business assets, and what had therefore represented a potential source of income ceased to exist. The emotional effect of losing her husband in such circumstance was described as devastating, and she has suffered, and continues to suffer long periods of depression. Mrs. Hinkle was unable to continue to care for her mother-in-law, who was moved to a nursing home. Mrs. Hinkle now lives alone.
The funeral expenses for Mr. Hinkle were $3,268.00.
Upon the foregoing findings of fact, the Court makes the following conclusions of law;
*26 a)
respondent is an agency of the State of West Virginia, with duties of general supervision and direction over the State’s road program and the construction, reconstruction, repair and maintenance of state roads and highways. W.Va. Code 17-2A-8.
b)
the State has a moral duty to keep its roads in a safe condition for travel on them. Price v. Sims, 134 W.Va. 173, 58 S.E.2d 657 (1970).
c)
the duty of the State is to exercise reasonable care and diligence in the maintenance of its highways under all circumstances. Shaffron v. Dept. of Highways, 9 W.Va. Ct. Cl. 176 (1974).
d)
respondent was negligent in its design and construction, in 1959, of the ramp carrying the Germany Valley Road over the cattle culvert at the scene of the accident in this case, in failing to make the ramp wide enough to carry, not only the paved portion of the orad, but also a berm of sufficient width for the safety of motor vehicles and travelers on said public road; said negligence was a proximate cause of the death of claimant’s decedent.
e)
respondent was negligent in failing to observe and repair an erosion of an already narrow berm at the scene of the accident, although its agents and servants had been in and around the point many times over a period of at least two years prior to the accident; and respondent’s negligence was a proximate cause of the accident of July 22, 1987, in which Mr. Hinkle died.
f)
respondent was negligent in failing to warn the traveling public of a dangerous condition in a public road, and to erect and maintain warning signs and controls; and respondent’s negligence was a proximate cause of said accident.
h)
claimant’s decedent knew or should have known of the defective berm prior to the accident, and his failure to avoid the defective berm was a proximate cause of the accident.
This Court has, in past decisions, held that a lower standard of care and maintenance is required for the berm or shoulder of a public road, than for the regularly traveled portion of the road, this being the so-called New York rule. An exception to the rule, recognized both in New York and West Virginia, is that the higher standard of care and maintenance required for the traveled portion of the road will be applied for the shoulder when an emergency requires it. See Retzel v. State, 94 Misc.2d 562, 405 N.Y.S.2d 391 (1978). The Retzel Court says that not only an emergency may require the higher standard of care and maintenance, but other circumstances may, also, make the higher standard of care *27 applicable, many states, of course, do not have the double standard of care, one for the traveled portion of the road and one for berms, and indeed, in view of the many, and varied, and legitimate, intended and necessary uses made of the berms by the motoring public, it is difficult to rationalize a double standard.
It is difficult also, perhaps more so, to understand how any standard of care and maintenance, however low, could justify or excuse the non-existence or substantial absence of a berm along a highway at a point only inches from a ten-foot drop over a steep embankment.
As a result of the combined negligence of respondent and of the decedent, proximately causing the death of Mr. Hinkle, the claimant has substantial damages 1) for the reasonable funeral expenses of the decedent, in the amount of $3,268.00, and 2) damages of $75,000.00 to Avanell R. Hinkle for mental anguish and for the loss of the care, support and society of her husband. The Court ascribes 25 % of the cause of the fatal accident to Mr. Hinkle, and, therefore, reduces the total damages of $78,268.00 by 25% to $58,701.00.
Award of $58,701.00.